UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                :

VANESSA MARIE MANISCALCO,        :
                                :

                   Plaintiff,      :        13 Civ. 4359 (KPF)
                                :

               v.               :        OPINION AND ORDER
                                :

ACTING COMMISSIONER CAROLYN W.  :
COLVIN OF SOCIAL SECURITY,        :
                                :

                   Defendant.  :
                                :

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 22, 2015

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Vanessa Marie Maniscalco filed this action pursuant to Section

205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review

of a decision of the Acting Commissioner of Social Security (the

"Commissioner") that denied Plaintiff's application for Social Security Disability

Insurance ("SSDI") based on a finding that Plaintiff was not disabled under the

Act.  The parties have cross-moved for judgment on the pleadings.  Because the

Commissioner's decision is supported by substantial evidence, Defendant's

motion is granted, and Plaintiff's motion is denied.

<h2 style="text-align:center">BACKGROUND[1]</h2>

**A.    Plaintiff's Physical and Mental Ailments**

      Plaintiff, born in 1975, claims disability since March 23, 2007, as a

result of back impairment, hip pain, asthma, depression and anxiety, and

---

[1]    The facts contained in this Opinion are drawn from the Social Security Administrative
    Record ("SSA Rec.") (Dkt. #6) filed by the Commissioner as part of her answer.  For

carpal tunnel syndrome.  (SSA Rec. 37, 167, 172).  Specifically, at her September 2011 administrative hearing, Plaintiff reported lower back pain radiating primarily down the right leg and leg numbness; an inability to lift her arms above eye level and bend over to pick something up from the floor; and difficulty lifting more than 5 pounds, sitting for more than 15 to 20 minutes at a time, and standing for more than 15 minutes at a time.  (*Id.* at 54, 56-57, 74-76).  Plaintiff testified that while medications alleviated her pain, they did not eliminate it completely.  (*Id.* at 65).  Plaintiff attributed the onset of her back pain to a 1996 car accident, and said that it was intermittent until 2007, when she reported it "got really bad."  (*Id.* at 62-63).

Plaintiff lived with her husband and children, who were ages 5 and 8 at the time of the September 2011 hearing.  (SSA Rec. 37-38).  Her mother, grandmother, and other family members helped her care for her children.  (*Id.* at 39).  Plaintiff spent the majority of her days in bed, watching television, and occasionally using a computer, on which she would do light online shopping, check and send email, and pay bills.  (*Id.* at 59, 68-71).  She usually interacted with her children while lying in bed.  (*Id.* at 62).  Sometimes her family brought her meals in bed, and sometimes she left her bedroom to eat in the dining area.  (*Id.* at 59-60).  She estimated that she spent approximately one hour outside her bedroom each day.  (*Id.* at 67).  Plaintiff reported that she did not do the laundry or the dishes, and that she had not done any household chores since

---

convenience, Plaintiff's supporting memorandum is referred to as "Pl. Br." and Defendant's supporting memorandum as "Def. Br."

2006.  (*Id.* at 60-61).  Her husband did most of the chores.  (*Id.* at 61).  Plaintiff stated that she could put on a shirt, but that putting on pants was difficult for her because she had trouble bending over.  (*Id.* at 73-74).  Plaintiff had an unrestricted driver's license.  (*Id.* at 89).  While usually a family member would take her or her daughter (who has a chronic illness called cyclic vomiting syndrome) to the doctor, she could drive herself or her daughter if there were an emergency.  (*Id.* at 88-92).

Plaintiff also reported problems with concentration and attention.  (SSA Rec. 75).  Plaintiff stated that her depression had gotten worse since 2007.  (*Id.* at 63).  She claimed to have difficulty sleeping because of her pain and depression, and took medication to help her sleep.  (*Id.* at 65).  Plaintiff reported symptoms of anxiety, such as racing thoughts and an inability to focus, and stated that she had crying spells once or twice a day.  (*Id.* at 66-67).

B.    **Plaintiff's Medical Evaluations**

It is uncontested that for Plaintiff to qualify for SSDI, her disability must have begun on or before December 31, 2008, when her insured status expired under the Act.  (*See* Pl. Br. 1 n.1; Def. Br. 2).  As noted above, Plaintiff claims the onset of disability occurred on March 23, 2007 (SSA Rec. 167), meaning the relevant period for her SSDI claim runs from March 23, 2007, through December 31, 2008 (*id.* at 23, 95).[2]

---

[2]    The SSA denied Plaintiff's prior claim of disability on the basis of her asthma on March 22, 2007.  (SSA Rec. 167-69, 172).

1.      **Medical Evidence Prior to December 31, 2008**

Prior to the alleged onset of her disability, in 1996, the same year she had her car accident, Plaintiff underwent magnetic resonance imaging ("MRI") of the lumbar spine.  (SSA Rec. 243).  The test revealed small central disk bulges at vertebrae L1-2, L2-3, and L5-S1 levels, and moderate central disk bulges at L3-4 and L4-5.  (*Id.*).  Otherwise, it showed that Plaintiff's nerve roots and exit foramina were "unremarkable," and that there was no significant spondylosis or facet degenerative disease.  (*Id.*).[3]

The first record of medical treatment during the relevant time period occurred on September 18, 2007, when Plaintiff saw Dr. Parvez Memon of East-West Medical Group LLC for asthma and left hip pain.  (SSA Rec. 297-98).  Dr. Memon reported Plaintiff's prior medical history only as "asthma."  (*Id.* at 297).  Dr. Memon assessed Plaintiff as having an upper respiratory infection, bronchospasm, asthma, and left hip pain.  (*Id.* at 297-98).  On October 5, 2007, an x-ray of Plaintiff's hip came back negative.  (*Id.* at 281).

On November 2, 2007, Plaintiff had an appointment with Dr. Memon in follow-up to her previous complaint of hip pain and to discuss new complaints of cold symptoms, anxiety, depression, and decreased sleep.  (SSA Rec. 301).

---

[3]      Spondylosis refers to abnormal wear or degeneration of cartilage and bones.  Cervical Spondylosis, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm (last visited Jan. 21, 2015).

The facet joints are the structures that connect the vertebrae to one another.  Facet Joint Disease, NYU Langone Medical Center, Department of Anesthesiology, Division of Pain Medicine, http://pain-medicine.med.nyu.edu/patient-care/conditions-we-treat/facet-joint-disease (last visited Jan. 21, 2015).

On examination, Dr. Memon determined that Plaintiff's left hip had full range of motion with no sign of mass or tumor on palpation. (*Id.*). Dr. Memon assessed Plaintiff as having an upper respiratory infection, asthma (which was stable), hip pain, and "anxiety/depression/insomnia," for which he prescribed Lexapro.[4]

On December 5, 2007, it appears that Plaintiff reported pain radiating to the middle of her lower back. (SSA Rec. 302).[5] On January 18, 2008, an MRI of Plaintiff's pelvis and left hip revealed no soft tissue or bone injury. (*Id.* at 279-80).[6] On May 14, 2008, Dr. Memon authorized another prescription for Lexapro. (*Id.* at 299).

On October 31, 2008, Plaintiff saw Dr. Memon with complaints of severe right-sided headaches for the previous two days and mild nasal congestion. (SSA Rec. 299-300). Dr. Memon's assessment was severe headaches and sinusitis. (*Id.*).[7] He prescribed Ultram, non-steroidal anti-inflammatory drugs

---

[4]   Lexapro is the brand name of escitalopram, which is used to treat depression and generalized anxiety disorder. Escitalopram, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (last visited Jan. 21, 2015).

[5]   This note in Plaintiff's medical records appears to be from a telephone call, not a visit as Plaintiff contends, as it is recorded on a page with contemporaneous call notes in the same handwriting. (SSA Rec. 302).

[6]   Plaintiff claims that on January 16, 2008, Dr. Memon prescribed the narcotic pain medication Percocet. (Pl. Br. 2). As Defendant points out, this is a misreading of the record. (Def. Br. 4 n.9). Apparently, Plaintiff has misread the abbreviation "precert," which appears throughout the notes on Plaintiff's medical record and plainly refers to the precertification required from insurance companies for certain treatments. (*See*, *e.g.*, SSA Rec. 299, 302).

[7]   Sinusitis is inflammation of the sinuses. Sinusitis, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/sinusitis.html (last visited Jan. 21, 2015).

("NSAIDS"), and Zithromax (a "Z-Pack").  (*Id.*).[8]  Dr. Memon also offered to refer Plaintiff for a computed tomography ("CT") scan.  (*Id.* at 300).[9]

### 2. Medical Evidence Subsequent to December 31, 2008

There is no record of Plaintiff having sought or received any medical treatment in 2009.  She did, however, consult with several doctors between 2010 and 2012.

#### a. Quasar Choudhury, M.D.

On July 21, 2010, Dr. Quasar Choudhury examined Plaintiff, who was complaining of sinus symptoms and lower back pain that she indicated she experienced after bending over.  (SSA Rec. 272-73).  Dr. Choudhury's assessment was sinusitis and low back and neck pain.  (*Id.* at 272).

On July 29, 2010, Plaintiff underwent an MRI exam of her cervical and lumbar spine.  (SSA Rec. 285-86).  As it concerns the cervical spine, the MRI results showed some "mild disc bulging" that was "age appropriate," and was otherwise normal.  (*Id.* at 285).  As for the lumbar spine, the MRI results

---

[8]     Ultram is the brand name of tramadol, which is used to relieve moderate to moderately severe pain.  Tramadol, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited Jan. 21, 2015).

Zithromax, also called a Z-Pack, is the brand name for the antibiotic azithromycin, which is used to treat certain bacterial infections.  Azithromycin, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697037.html (last visited Jan. 21, 2015).

[9]     Plaintiff claims that during this examination, Dr. Memon noted a history of migraines and lower back pain ("LBP").  (Pl. Br. 2, 9).  With regards to the latter, as Defendant points out, Plaintiff has again misread the record.  (Def. Br. 15).  The abbreviation actually recorded is "LMP," standing for "last menstrual period," which he noted was "one week" prior and that Plaintiff "denie[d] possibility of pregnancy."  (*Id.*; SSA Rec. 299).

revealed, at L4-5, a right lateral neural foraminal tear and protrusion, which impinged the existing L4 nerve root. (*Id.* at 286).

From August through December 2010, Dr. Choudhury saw Plaintiff on approximately a monthly basis. (*See* SSA Rec. 267-71). On August 3, 2010, Plaintiff saw Dr. Choudhury in follow-up to her MRI results. (*See id.* at 286, 271). Dr. Choudhury's notes from this visit reflect Plaintiff's first complaint of right upper extremity symptoms, and he recorded a positive finding for carpal tunnel syndrome. (*Id.* at 271). On August 18, 2010, Plaintiff returned to Dr. Choudhury's office complaining of continued back and arm pain numbness in her legs. (*Id.* at 270). Dr. Choudhury noted that Plaintiff also informed him during that examination that she had experienced depression since 1990. (*Id.*). On September 30, 2010, Plaintiff came in complaining of low back pain (*id.* at 269), and the following month, on October 26, 2010, Plaintiff came in complaining of low back and left hip pain (*id.* at 268). At a visit in December 2010, Plaintiff complained primarily of bronchial symptoms, but also of low back pain. (*Id.* at 267).

In late 2010, Dr. Choudhury completed a "Multiple Impairment Questionnaire" at the request of the Social Security Administration. (SSA Rec. 261-65).[10] Dr. Choudhury reported that he first examined Plaintiff in May 2010, and saw her on an approximately monthly basis. (*Id.* at 262). Dr.

---

[10]     Plaintiff notes the date of this questionnaire as December 30, 2010, while Defendant records it as October 28, 2010. (Pl. Br. 2; Def. Br. 6). The date on the form itself is partially illegible; while it is clear that the questionnaire is dated on the 28th of some double-digit month in 2010, it could be October, November, or December. (SSA Rec. 265). The particular date is immaterial to the resolution of the parties' motions.

Choudhury listed Plaintiff's treating diagnosis as low back pain secondary to degenerative disease. (*Id.*). He noted that treatment included pain management with Vicodin, which had a side effect of fatigue. (*Id.* at 261). He described her back pain as moderate to severe. (*Id.* at 262, 264).

Dr. Choudhury described Plaintiff's condition as "chronic/permanent" and her prognosis as "guarded," and noted that she displayed no behavior suggestive of a significant psychiatric disorder. (SSA Rec. 261). He further noted that cause of the low back pain was a motor vehicle accident in 1996. (*Id.*). As it concerned Plaintiff's ability to work, Dr. Choudhury stated that Plaintiff could occasionally lift and carry up to 10 pounds, could stand or walk for up to 2 hours, and could sit for up to 6 hours per day. (*Id.* at 264). He further noted that Plaintiff was limited in her ability to push or pull, but did not specify which body part was affected or note the degree of any limitation. (*Id.*). He also reported that there were no other conditions that were significant to Plaintiff's recovery. (*Id.* at 265).

On March 15, 2011, three months after her previous appointment with Dr. Choudhury, Plaintiff returned complaining of a cough and cold. (SSA Rec. 266). A pulmonary function test performed that same day was normal. (*Id.* at 278). In addition, Plaintiff recounted having lower back pain since 2008. (*Id.* at 266). Dr. Choudhury's records indicate that, during that visit, Plaintiff requested a letter of disability to cover year 2008. (*Id.*).

On May 11, 2011, Dr. Choudhury completed a second "Multiple Impairment Questionnaire" for Plaintiff, in which he noted that he last saw

8

Plaintiff in March 2011, and saw her approximately every three months.  (SSA Rec. 289-96).  This time, however, Dr. Choudhury wrote that the symptoms and limitations contained in his report were applicable as of 1996.  (*Id.* at 295).  He reported that his diagnoses were lumbosacral spine disc disease, cervical spine degenerative joint disease, and right carpal tunnel syndrome.  (*Id.* at 289).  He stated that Plaintiff's prognosis was "poor."  (*Id.*).

Dr. Choudhury described Plaintiff's pain as constant and as a "4" ("moderate") on a scale of 1 to 10.  (SSA Rec. 291).  He opined that, on an average work day, Plaintiff could not stand, sit, or walk for more than one hour.  (*Id.*).  Additionally, he noted that he did not recommend Plaintiff sitting continuously in a work setting, and that she would need to get up and move around every 15 to 20 minutes.  (*Id.*).  Dr. Choudhury further stated that Plaintiff exhibited constant fatigue, and could not tolerate low stress.  (*Id.* at 294).

On June 14, 2011, Plaintiff returned to Dr. Choudhury, complaining of back pain, a right arm that "bother[ed]" her, and fatigue.  (SSA Rec. 313).  Dr. Choudhury also saw Plaintiff in July and September 2011, for complaints of respiratory problems and back pain.  (*Id.* at 310, 314-15).  On September 11, 2011, Dr. Choudhury performed a peripheral arterial flow study of both of Plaintiff's legs, which he recorded as within normal limits.  (*Id.* at 311).

On September 22, 2011, Dr. Choudhury wrote a letter stating that Plaintiff's "record indicated low back pain with herniated disc started before

2008." (SSA Rec. 239).[11]  He further claimed that Plaintiff had peripheral vascular disease with "neuropathy, carpal tunnel syndrome and gastrop[a]resis." (*Id.*).[12]  He also wrote that Plaintiff was "suffering from panic attack, [general anxiety disorder] & depression." (*Id.*).  Additionally, Dr. Choudhury claimed that Plaintiff "gets side effects of medication" — without specifying the nature or severity of those side effects — and was "totally disable[d]." (*Id.*).

On August 9, 2012 — well after the October 25, 2011 decision of the Administrative Law Judge ("ALJ") on Plaintiff's SSDI claim — Dr. Choudhury prepared a third "Multiple Impairment Questionnaire" for Plaintiff to use as part of her request for review of that decision.  (*See* SSA Rec. 4; Pl. Br. Ex. A).  Dr. Choudhury's August 2012 questionnaire was similar to his May 2011 questionnaire, with a few notable exceptions.  The 2012 questionnaire now listed a history of depression, anxiety, and panic attacks.  (Pl. Br. Ex. A at 1, 6).

---

[11]    Given its proximity to Plaintiff's hearing before the ALJ, Dr. Choudhury's letter, which is addressed only to "To whom it may concern," was presumably prepared for that hearing.

[12]    Peripheral vascular disease, also called peripheral artery disease, is a circulatory problem in which narrowed arteries reduce blood flow to the limbs.  Peripheral Artery Disease, Mayo Clinic, Diseases and Conditions, http://www.mayoclinic.org/diseases-conditions/peripheral-artery-disease/basics/definition/con-20028731 (last visited Jan. 21, 2015).

Neuropathy is damage to a nerve or nerve group, and may cause various symptoms depending on which nerve or nerve group is affected.  Peripheral Neuropathy, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000593.htm (last visited Jan. 21, 2015).

Gastroparesis is a condition that reduces the ability of the stomach to empty its contents; it does not involve full obstruction.  Gastroparesis, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000297.htm (last visited Jan. 21, 2015).

He changed his description of the nature of Plaintiff's pain from "aching or burning" to "sharp," and increased her pain level from a "4" to a "6." (*Id.* at 2-3). He also modified his assessment that she could lift and carry 5-10 pounds occasionally by now indicating that she was limited to lifting and carrying 0-5 pounds occasionally. (*Id.* at 4). Finally, Dr. Choudhury modified the date of onset of Plaintiff's symptoms: In his May 2011 questionnaire, Dr. Choudhury had written that Plaintiff's symptoms and limitations in the questionnaire were applicable in "1996." (SSA Rec. 295). But in his August 2012 questionnaire, he changed that response to "2007 and 2008." (Pl. Br. Ex. A at 7).

### b.    Ramesh Damacharia, M.D.

On October 27, 2010, Dr. Ramesh Damacharia, a specialist in pain medicine, examined Plaintiff upon a referral from Dr. Choudhury. (SSA Rec. 241-42). Plaintiff complained of low back pain that radiated to her extremities, and she reported to have "sustained this pain while she was bending down to pick up a sheet, which happened in July 2010." (*Id.* at 242). Dr. Damacharia observed that Plaintiff had a normal affect and mood. (*Id.*). On examination, her muscle tone was found to be normal, as was her muscle power in her legs. (*Id.*). Plaintiff's "sensation and discrimination" of "light touch and pinprick" were "preserved in both lower extremities." (*Id.*). Dr. Damacharia reported that Plaintiff exhibited decreased range of motion in the lumbar spine, and a straight leg raising test was positive for both legs.[13] She

---

[13]     Straight leg raising tests are done to help determine the cause of low back pain; a positive (abnormal) result indicates that one or more of the nerve roots leading to the sciatic nerve may be compressed or irritated. Straight-Leg Test for Evaluating Low

also showed midline and paravertebral tenderness on both sides and tenderness of the sacroiliac joint. (*Id.*).[14]  Dr. Damacharia's impression was back pain due to (i) mild spinal stenosis at L4-5 level, and (ii) possible lumbar radiculopathy secondary to nerve root impingement. (*Id.* at 240).[15]  Dr. Damacharia scheduled Plaintiff for an episteroid injection at the L4 level. (*Id.*).

### c.   Joseph DeFeo, M.D.

On April 23, 2012, subsequent to the October 25, 2011 decision of the ALJ, Dr. Joseph DeFeo, an orthopedic surgeon, prepared a narrative report and "Multiple Impairment Questionnaire" based on an examination of Plaintiff and her medical records. (Pl. Br. Ex. B at 1, 4).  Dr. DeFeo noted that Plaintiff entered his office with a cane, a splint on the right wrist, and a sling on her right arm. (*Id.* at 3).  In his review, Dr. DeFeo considered Plaintiff's asthma to be her "most debilitating condition," noting that she had been hospitalized for it in 2001. (*Id.* at 1).  Plaintiff reported to Dr. DeFeo that she could walk one to two blocks, could sit or stand for 15-20 minutes at a time, and could lift no more than 5-10 pounds. (*Id.* at 3).  Dr. DeFeo reported decreased muscle strength in Plaintiff's extremities at 3+ on a scale of 5, and that she had

---

Back Pain, WebMD, http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview (last visited Jan. 21, 2015).

[14]   The sacroiliac joint is the joint where the sacrum (base of the spine) and iliac (pelvis) bones join.  Sacroiliac Joint Pain – Aftercare, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000610.htm (last visited Jan. 21, 2015).

[15]   Radiculopathy is "[a] nerve root injury ... sometimes referred to as a 'pinched' nerve." Cervical Radiculopathy (Pinched Nerve), American Academy of Orthopaedic Surgeons, OrthoInfo, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (last visited Jan. 21, 2015).

reduced range of motion in her back and extremities.  (*Id.* at 3-4).  He also noted a loss of sensation in Plaintiff's right lower leg.  (*Id.* at 4).

Dr. DeFeo reported that Plaintiff's multiple points of pain suggests "the possibility of the existence of a Fibromyalgia Syndrome[,] which would be consistent in view of claimant's chronic depression."  (Pl. Br. Ex. B at 4). Among Dr. DeFeo's diagnoses were "lumbo-sacral spondylosis with a herniated disc" and a "similar problem involving the cervical spine."  (*Id.* at 5).  Dr. DeFeo also remarked that Plaintiff has a "recent onset of symptoms and diagnoses ... [of] Carpal Tunnel Syndrome of the right hand."  (*Id.*).  He also identified possible diagnoses of "classic Fibromyalgia Syndrome or chronic myofascitis." (*Id.*).

In light of these diagnoses, as well as Plaintiff's "acute asthmatic attacks," Dr. DeFeo rated her disability as "total."  (Pl. Br. Ex. B at 5).  In the questionnaire, Dr. DeFeo noted that Plaintiff exhibited severe symptoms and work-related functional limitations.  (*Id.* at 8-13).  Significantly, however, he noted the symptoms and limitations contained in his report were applicable as of 2003, four years before the alleged onset of the disabilities on which Plaintiff's current suit is based.  (*Id.* at 13).

## C.    Plaintiff's Work History

Plaintiff completed "about a year of college."  (SSA Rec. 40-41).  She was in a car accident in 1996, but did not stop working until 2003.  (*Id.* at 50, 62). From 1996 to 2003, Plaintiff worked as a receptionist, and also had billing and collections responsibilities.  (*Id.* at 47-48, 50).  Plaintiff stated that her

employer had "let her go" for having missed too many days at work due to illness.  (*Id.* at 50).  From 2003 to 2007, Plaintiff was a "regular at-home mom," caring for her two young children.  (*Id.* at 62).  She reported that in 2007, her lower back pain became worse, and she ceased participating in household chores and activities.  (*Id.* at 63, 82).

**D.      Social Security Administrative Proceedings**

Plaintiff filed applications for SSDI benefits on August 3, 2010, alleging disability since March 23, 2007.  (SSA Rec. 151-54).  Plaintiff's application was denied by the Social Security Administration on November 10, 2010.  (*Id.* at 96-100).

At Plaintiff's request, a hearing was held before ALJ Michael Rodriguez on September 26, 2011, at which Plaintiff and her counsel were present.  (SSA Rec. 32-93).  The ALJ conducted a *de novo* review of the record and on October 25, 2011, issued a decision finding that Plaintiff was not disabled.  (*Id.* at 21-28).  The decision became final on May 10, 2013, when the Appeals Council denied Plaintiff's request for review.  (*Id.* at 3-8, 15).

Thereafter, Plaintiff sought further review of the Commissioner's determination, arguing that the Appeals Council had not considered the 2012 reports and questionnaires from Dr. Choudhury and Dr. DeFeo submitted with the original request to review.  (SSA Rec. 1-2).  The agency construed Plaintiff's request as one to "reopen and change the decision."  (*Id.* at 1).  The agency denied that application, noting that the Appeals Council explicitly stated that it considered and rejected the new information because it did "not affect the

14

decision about whether you were disabled at the time you were last insured for disability benefits." (*Id.*).

In his decision, the ALJ first determined whether Plaintiff was engaged in substantial gainful activity, and noted that "'[s]ubstantial work activity' is work activity that involves doing significant physical or mental activities," while "'gainful work activity' is work that is usually done for pay or profit, whether or not a profit is realized.'" (SSA Rec. 22 (citing 20 C.F.R. § 404.1572(a), (b))).[16] If an individual is engaged in substantial gainful activity, she is deemed not disabled. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ determined that Plaintiff had not been engaged in substantial gainful activity during the period from her alleged onset date of March 23, 2007, through her date last insured of December 31, 2008. (SSA Rec. 23).

---

[16]     The SSA employs a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled."). The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [her *per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (citing *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

Having determined that Plaintiff was not engaged in substantial gainful activity, the ALJ proceeded to step two of the analysis.  The ALJ assessed whether Plaintiff had a medically determinable impairment that was "severe" or a combination of impairments that was "severe."  20 C.F.R. § 404.1520(c).  "An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (SSA Rec. 22 (citing 20 C.F.R. § 404.1521 and Social Security Rulings ("SSR") 85-28, 96-3p, and 96-4p)).  Conversely, "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (*Id.*).  If a claimant does not have either a severe medically determinable impairment or a combination of impairments, she is not disabled.  (*Id.*).

The ALJ determined that Plaintiff had the following severe impairments through the date last insured: degenerative joint disease of the hip; asthma; anxiety and depression.  (SSA Rec. 23).  He found that Plaintiff's degenerative joint disease of the lumbosacral spine and carpal tunnel syndrome were not severe impairments.  (*Id.*).  Specifically, the ALJ noted that there was no evidence prior to Plaintiff's date last insured of back pain, and that prior to that date all diagnostic testing had been negative.  (*Id.*).

The ALJ then moved on to the third step of the analysis, to determine "whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of impairment listed in 20 CFR

16

Part 404, Subpart P, Appendix 1." (SSA Rec. 22 (citing 20 C.F.R.

§§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)). The

ALJ determined that Plaintiff did not have "an impairment or combination of

impairments that meets or medically equals the severity of one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1." (SSA Rec. 23). In

making this determination, the ALJ considered listings 1.00 (Musculoskeletal

System) and 12.00 (Mental Disorders), but found that Plaintiff's conditions did

not meet the severity of their respective requirements. (*Id.* at 24 (citing 20

C.F.R. § 404, Subpart P, Appendix 1)).

As it concerns Plaintiff's alleged mental disabilities, the ALJ underwent a

detailed analysis of 12.04 (Affective Disorders) and 12.06 (Anxiety Related

Disorders). (SSA Rec. 24). Specifically, he considered whether the "paragraph

B" criteria of each disorder were satisfied. (*Id.*). In order to satisfy "paragraph

B" criteria, the mental impairments must result in at least two of the following:

(i) marked restriction of activities of daily living; (ii) marked difficulties in

maintaining social functioning; (iii) marked difficulties in maintaining

concentration, persistence, or pace; or (iv) repeated episodes of decompensation

(i.e., temporary increases in symptoms), each of extended duration. (*Id.* (citing

20 C.F.R. § 404, Subpart P, Appendix 1, 12.04(B) & 12.06(B))). The ALJ noted

that a "marked limitation means more than moderate but less than extreme,"

and that "[r]epeated episodes of decompensation, each of extended duration,

means three episodes within 1 year, or an average of once every 4 months,

each lasting for at least 2 weeks." (*Id.*). The ALJ determined that Plaintiff's

mental impairments did not cause at least two "marked" limitations, nor did they cause one "marked" limitation and "repeated episodes of decompensation." (*Id.*).  Specifically, the ALJ found that Plaintiff had mild difficulties in activities of daily living and social functioning; had moderate difficulties with concentration, persistence or pace; and had experienced no episodes of decompensation of extended duration.  (*Id.*).  The ALJ then assessed whether the "paragraph C" criteria were satisfied, determining that the evidence failed to establish the presence of those criteria.  (*Id.*).

The ALJ then proceeded to evaluate Plaintiff's residual functional capacity ("RFC").  The ALJ found that, through the date last insured, Plaintiff:

> had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she required a sit-stand option.[17]  She was able to perform constant left upper extremity overhead, distance, and directional reaching with occasional upper right extremity reaching. She could perform frequent bilateral fine and gross manipulations. She should avoid exposure to temperature extremes, humidity, wetness, fumes, gases, dust, odors, and hazards. She was limited to low stress unskilled jobs but was able to engage in frequent interaction with the public and co-workers.

(SSA Rec. 24).  In reaching this determination, the ALJ considered (i) "all symptoms and the extent to which these symptoms can reasonably be accepted

---

[17]     "The applicable regulations explain that 'sedentary work' involves 'lifting no more than 10 pounds at a time,' 'sitting,' and a 'certain amount of walking or standing.'  The Social Security Administration has further explained that at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  *Penfield* v. *Colvin*, 563 F. App'x 839, 840 n.1 (2d Cir. 2014) (summary order) (citing, *inter alia*, *Determining Capability to Do Other Work — Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, 61 Fed. Reg. 34478, 34480 (Soc. Sec. Admin. July 2, 1996)).

as consistent with the objective medical evidence and other evidence"; and
(ii) "opinion evidence." (*Id.* (internal citations omitted)).

Turning to the first category, in considering Plaintiff's symptoms, the ALJ
followed a two-step process. First, he determined whether there was an
underlying impairment "that could reasonably be expected to produce the
claimant's pain or other symptoms." (SSA Rec. 25). Second, the ALJ evaluated
the "intensity, persistence, and limiting effects of the claimant's symptoms to
determine the extent to which they limit the claimant's functioning." (*Id.*). In
this regard, he observed that "whenever statements about the intensity,
persistence, or functionally limiting effects of pain or other symptoms are not
substantiated by objective medical evidence, [the ALJ] must make a finding on
the credibility of the statements based on a consideration of the entire case
record." (*Id.*).

After careful consideration of all the evidence, the ALJ found that while
Plaintiff's medically determinable impairments could reasonably be expected to
cause the alleged symptoms, her "statements concerning the intensity,
persistence, and limiting effects of these symptoms [were] not credible." (SSA
Rec. 25). First, the ALJ considered the medical opinions and evidence, starting
with Dr. Choudhury's records, which spanned 2007 through 2011. He noted
that they showed treatment for complaints of back and hip pain, as well as
routine upper respiratory infections. (*Id.*). They further indicated that Plaintiff
had been prescribed pain medications. The ALJ observed that the January
2008 MRI of Plaintiff's hip showed "no evidence of fracture or soft tissue

19

injury"; that the July 2010 MRI of Plaintiff's cervical spine showed "mild disc bulging without herniation or stenosis"; and that the July 2010 MRI of Plaintiff's lumbosacral spine showed right disc protrusion with impingement of the L4 nerve root.  (*Id.*).

The ALJ considered Dr. Choudhury's May 2011 questionnaire, in which Dr. Choudhury opined that Plaintiff was unable to lift or carry more than 10 pounds occasionally and unable to stand, walk, or sit for more than one hour per day due to back and hip pain.  (SSA Rec. 25).  The ALJ remarked that Dr. Choudhury had indicated that Plaintiff suffered from these symptoms since 1996.  (*Id.*).  The ALJ further observed that in a later report dated September 22, 2011, Dr. Choudhury noted that Plaintiff currently suffered from back pain, asthma, allergic rhinitis, peripheral vascular disease with neuropathy, carpal tunnel syndrome, panic attacks, and general anxiety disorder and depression.  (*Id.*).

The ALJ noted that Plaintiff had been treated and prescribed medication by Dr. Memon in 2007 and 2008 for complaints of asthma, back and hip pain, and depression/anxiety.  (SSA Rec. 25).

The ALJ then turned to the subjective complaints of Plaintiff herself, which complaints included disabling back and hip pain, asthma, and depression.  (SSA Rec. 25).  He found that the medical evidence simply did not substantiate the allegations of Plaintiff to the degree alleged.  (*Id.* at 25-26). Specifically, the ALJ noted the dearth of medical evidence prior to Plaintiff's date last insured; the sparse evidence that was available confirmed some of her

medically determinable impairments, but did not confirm her back impairment or carpal tunnel syndrome. (*Id.* at 26). He observed that, while there were "some treatment notes for asthma, left hip pain and anxiety/depression," there was no evidence of any hospitalizations, emergency room treatments, or any specific mental health treatment. (*Id.*). The ALJ further remarked that MRI studies of the pelvis and left hip taken in October 2007 and January 2008 were negative, and in November 2007 Plaintiff was noted to have full range of motion in her left hip. (*Id.*). While evidence from *after* the date last insured showed positive MRI studies for lower back pain and degenerative joint disease of the lumbar spine, the ALJ observed, Plaintiff's complaints *before* the date last insured were all about her hip. The evidence from that time — negative MRIs and x-rays — did not support her testimony. (*Id.*).

With regards to Dr. Choudhury's opinion evidence — that Plaintiff was unable to sit, stand or walk for more than one hour since 1996 — the ALJ found that the opinion was "simply not supported by the medical evidence and [] completely unreliable." (SSA Rec. 26). The ALJ observed that Dr. Choudhury's opinion "appear[ed] to be guesses regarding [Plaintiff's] condition with no treatment reports or diagnostic testing supporting those limitations." (*Id.*). There was no pre-date-last-insured history of back or hand/wrist complaints. (*Id.*). Ultimately, the ALJ found that his RFC assessment — that Plaintiff could perform sedentary work with certain limitations — was "supported by the extremely scant evidence of any medical treatment prior to

21

the [Plaintiff's] date last insured and the minimal findings on diagnostic testing that was done prior to the date last insured." (*Id.*).

At step four, the ALJ compared Plaintiff's RFC to her relevant work history. (SSA Rec. 26). Because Plaintiff's past relevant work as a medical billing clerk and receptionist had required excessive exertional and non-exertional requirements, the ALJ determined that Plaintiff was unable to perform her past relevant work. (*Id.*).

At step five, the ALJ determined whether there was other work that Plaintiff could perform through the date last insured, taking into consideration her age, education, work experience, residual functional capacity, and the Medical-Vocational Guidelines. (SSA Rec. 27 (citing 20 C.F.R. § 404, Subpart P, Appendix 2)). The ALJ noted that if Plaintiff could "perform all or substantially all of the exertional demands of a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimant's specific vocational profile." (*Id.* (citing SSR 83-11)). In contrast, when a claimant "cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or nonexertional limitations." (*Id.* (citing SSRs 83-12 and 83-14)). The ALJ further opined that if a claimant "has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making." (*Id.* (citing SSR 85-15)).

22

The ALJ determined that, because Plaintiff did not have the ability to perform the full range of sedentary work through the date last insured, but was impeded by additional limitations, Medical-Vocational Rule 201.28 did not mandate a finding of "not disabled."  (SSA Rec. 27).  Thus, at the hearing, the ALJ consulted a vocational expert to determine whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity.  (*Id.*).  In his opinion, the ALJ noted that the vocational expert testified that an individual with all these factors would have been able to perform the requirements of representative occupations, such as order clerk, of which there were 211,376 jobs in the national economy, 8,610 jobs in the state economy, and 140 jobs in the regional economy; a new accounts clerk, of which there were 67,170 jobs in the national economy, 4,660 jobs in the state economy, and 230 jobs in the regional economy; and a security systems surveillance monitor, of which there were 79,280 jobs in the national economy, 2,010 jobs in the state economy, and 60 jobs in the regional economy.  (*Id.*).  The ALJ determined that, pursuant to SSR 00-4p, the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles.  Based on this testimony and considering Plaintiff's circumstances and residual functional capacity, the ALJ concluded that, through the date last insured, Plaintiff was capable of making successful adjustment to work.  Because the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed through the date last insured, he arrived at

a finding of "not disabled" under the rules.  (*Id.*; *see also id.* at 26 (citing 20 C.F.R. §§ 404.1569, 404.1569(a))).

**E.     The Instant Litigation**

Plaintiff initiated this action on June 24, 2013.  (Dkt. #1).  The Commissioner filed the Administrative Record on December 9, 2013, and her answer on January 3, 2014.  (Dkt. #6, 7).  The parties proceeded thereafter to file competing motions for judgment on the pleadings: Plaintiff filed her motion on February 9, 2014 (Dkt. #10-11), and the Commissioner filed her motion on July 2, 2014 (Dkt. #21-22).

## DISCUSSION

**A.     Applicable Law**

**1.     Motions Under Federal Rule of Civil Procedure 12(c)**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway*

24

*Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

### 2. Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate her "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Butts*, 388 F.3d at 383.  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

In reviewing the final decision of the Social Security Administration, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

25

Social Security, with or without remanding the cause for a rehearing."  42
U.S.C. § 405(g).

A court must uphold a final SSA determination to deny benefits unless
that decision is unsupported by substantial evidence or is based on an
incorrect legal standard.  *Selian*, 708 F.3d at 417 ("In reviewing a final decision
of the SSA, this Court is limited to determining whether the SSA's conclusions
were supported by substantial evidence in the record and were based on a
correct legal standard." (citing *Talavera*, 697 F.3d at 145)); *see also id.* ("If there
is substantial evidence to support the determination, it must be upheld.").
More than that, where the findings of the SSA are supported by substantial
evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d
Cir. 1995) ("The findings of the Secretary are conclusive unless they are not
supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate to support a
conclusion."  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402
U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential
standard of review — even more so than the clearly erroneous standard."
*Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  To make
this determination — whether the agency's finding were supported by
substantial evidence — "the reviewing court is required to examine the entire
record, including contradictory evidence and evidence from which conflicting

26

inferences can be drawn." *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

**B.    The ALJ's Decision Is Supported by Substantial Evidence**

Given these standards, there is no basis to overturn the Commissioner's decision.  A careful review of the record confirms that the ALJ's decision was based on the correct legal standard and supported by substantial evidence.

The ALJ correctly identified the two issues for his determination: (i) whether Plaintiff was disabled under Sections 216(i) and 223(d); and (ii) whether Plaintiff's status requirements of Sections 216(i) and 223 were met. (SSA Rec. 21).  As to the latter issue, the ALJ found that Plaintiff's earnings record showed that she had acquired sufficient quarters of coverage to remain insured through December 31, 2008.  There is no reason to doubt the accuracy of this determination, and the parties do not dispute it.

Proceeding to the primary issue — whether Plaintiff was disabled — the ALJ applied the correct legal standard by employing the five-step evaluation mandated under the regulations.  *See* 20 C.F.R. § 404.1520(a).  The ALJ conducted a scrupulous review of Plaintiff's testimony, her medical records, and the opinions of her treating and consultative physicians.  Further, the ALJ's determination was supported by substantial evidence, in the form of Dr. Memon's records, Plaintiff's MRI and x-ray reports, Dr. Choudhury's reports, and the evidence provided regarding Plaintiff's work history.  Plaintiff objects, however, that the ALJ's decision was not supported by substantial evidence, and raises three overarching challenges to his determinations.  The first two

27

concern the ALJ's credibility assessments when determining Plaintiff's residual

functioning capacity, while the third concerns new evidence submitted after the

ALJ's decision.

### 1.    The ALJ's Assessment of Dr. Choudhury's Opinion Was Supported by Substantial Evidence

First, Plaintiff contends that the ALJ improperly rejected Dr.

Choudhury's opinion.  (Pl. Br. 8-11).  He did not.  As noted, Dr. Choudhury

was Plaintiff's treating physician, who evaluated Plaintiff for the first time in

July 2010; he then completed functional assessments in late 2010 and May

2011, and submitted a narrative report in September 2011.  As the ALJ noted,

in the second of his two questionnaires,[18] Dr. Choudhury opined that Plaintiff

had several limitations to her work ability — including that she was unable to

sit, stand, or walk for more than one hour — and that she had suffered these

limitations, and her symptoms, since 1996.  The ALJ properly concluded that

this aspect of Dr. Choudhury's opinion was poorly supported and appropriately

assigned it little weight.  Then, in his September 2011 report, Dr. Choudhury

asserted that Plaintiff was "totally disabled" and had had a herniated disc and

low back pain since "before 2008"; here, too, Dr. Choudhury pointed to no

medical evidence for these conclusions.  Such bald, conclusory opinions of

disability from a physician are not entitled to any special significance.  *See*

*Snell* v. *Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[S]ome kinds of

findings — including the ultimate finding of whether a claimant is disabled ...

---

[18]    That is, the later of the two that had been submitted at the time the ALJ issued his decision.

are reserved to the Commissioner....  A treating physician's statement that the claimant is disabled cannot itself be determinative.").

In fact, the lack of support for Dr. Choudhury's opinion is evident from the record.  Dr. Choudhury indicated in his questionnaire that his opinion was based upon an MRI study that was positive for degenerative joint disease, yet there is no MRI study from the relevant time period having such results.  (SSA Rec. 290).  The 1996 MRI that Dr. Choudhury purports to have reviewed was not positive for degenerative joint disease (*id.* at 243),[19] and the 2010 MRIs taken under Dr. Choudhury's care were taken after the date last insured (*id.* at 285-86).

Dr. Choudhury's report also stated that his functional assessment related back to 1996, when Plaintiff was involved in an automobile accident. Yet Plaintiff's medical records reveal no visits to Dr. Choudhury's practice prior to July 2010, and no medical record evidence supports extending his opinion back that far, or even to the relevant time period of 2007 to 2008.  (SSA Rec. 272-73).  Plaintiff argues that her report of low back pain to someone at Dr. Memon's office on one occasion in 2007 (*id.* at 302), and her 1996 MRI taken after the car accident, support Dr. Choudhury's position that she was disabled in the relevant time period.  (Pl. Br. 9).  As Defendant points out, and as mentioned above, the 2007 notation that states "pain radiating toward

---

[19]     It is not clear from the record *when* Dr. Choudhury reviewed this record, and whether it was in fact prior to his 2010 and 2011 functional assessment questionnaires.  It may be that Dr. Choudhury drew this 1996 date from conversations with Plaintiff during her examination regarding her car accident.

middle of back" (SSA Rec. 302) is not Dr. Memon's clinical impression.  (*See*
Def. Br. 15).[20]  Indeed, there are no clinical findings or diagnosis related to this
comment, or to lower back pain in 2007 or 2008.  As for the 1996 MRI, it
shows only some mild and moderate disc bulging, and the findings were
otherwise "unremarkable," not revealing any more serious conditions such as
disc herniation, spondylosis, or any involvement of Plaintiff's nerve roots.  (*See*
SSA Rec. 243).  What is more, Plaintiff continued to work until 2003, seven
years after this MRI was taken, and did not allege disability until 2007, eleven
years later.[21]  Additionally, over a year and a half passed after Plaintiff's
insured status expired before she sought any medical treatment for low back
pain.

     "Although the treating physician rule generally requires deference to the
medical opinion of a claimant's treating physician, the opinion of the treating
physician is not afforded controlling weight where, as here, the treating
physician issued opinions that are not consistent with other substantial
evidence in the record."  *Penfield*, 563 F. App'x at 840 (internal citation and
quotation marks omitted); *Lewis* v. *Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013)

---

[20]   Significantly, the notation regarding lower back pain is not in the same handwriting as
      Dr. Memon's examination notes.  Rather, it is in the handwriting of an office staff
      member who had communications with Plaintiff's insurance company regarding
      precertifications.  (*Compare* SSA Rec. 302 (notes dated Dec. 5, 2007, and Dec. 10,
      2007), *with id.* at 297-98 (notes dated Sept. 18, 2007)).

[21]   Although the ALJ notes that he did not review the 1996 MRI because Plaintiff failed to
      attach it to her submission, this test with "unremarkable" results that was taken over a
      decade prior to the onset of Plaintiff's alleged disability cannot suffice to meet her
      burden of demonstrating a severe back impairment in 2007 and 2008.  *See Coleman* v.
      *Shalala*, 895 F. Supp. 50, 54 (S.D.N.Y. 1995) (holding "unremarkable" findings did not
      support statement asserting total disability).

(summary order) ("With respect to [a treating physician's] opinion, the ALJ was not required to give it controlling weight where it was unsupported by the objective medical evidence." (internal citation omitted)).  This is precisely what the ALJ did here, and the record supports his decision to do so.  *See De La Cruz* v. *Colvin*, No. 12 Civ. 3660 (SAS), 2014 WL 2998531, at *11 (S.D.N.Y. July 3, 2014) ("[T]he ALJ did not err in placing limited weight on Dr. Tedoff's findings because they were inconsistent with the medical evidence[.]").[22]

### 2.  The ALJ's Assessment of Plaintiff's Credibility Was Supported by Substantial Evidence

Plaintiff's second objection is that the ALJ failed to evaluate Plaintiff's credibility properly when determining her residual functional capacity.  The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations: first, the ALJ must "decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," and second, if the claimant does suffer such an impairment, "the ALJ must consider the 'extent to which the [claimant's] symptoms can reasonably be accepted as consistent with the

---

[22]    As Defendant points out, the two Second Circuit cases on which Plaintiff relies to support her argument that controlling weight should be given to a treating physician's retrospective opinion are distinguishable here.  (Def. Br. 18-20).  Namely, in both, the record contains significant medical evidence of disability during the time in dispute, and the plaintiff was found disabled subsequent to the relevant time period.  *See Rivera* v. *Sullivan*, 923 F.2d 964, 969 (2d Cir. 1991) (crediting treating physician's retrospective opinion of disability in the relevant period where physician reviewed supporting records from relevant period and where Secretary had determined claimant disabled under treating physician's care); *Wagner* v. *Sec'y of Health & Human Servs.*, 906 F.2d 856, 857-60, 862 (2d Cir. 1990) (crediting treating physician's retrospective opinion that the disabling symptoms he himself chronicled during the relevant time period were caused by the same syndrome responsible for her present disability).

objective medical evidence and other evidence'" of the record.  *Genier* v. *Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)-(b)).

When a claimant alleges symptoms and a greater restriction of function than can be demonstrated by objective medical evidence alone, the ALJ considers factors including the claimant's daily activities; the type, dosage, effectiveness, and side effects of medications; other treatments or pain relief measures; and other factors.  *See* 20 C.F.R. § 404.1529(c).  However, "[t]he ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *McLaughlin* v. *Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980) (internal quotation marks and citation omitted).  The Court will uphold the ALJ's decision to discount a claimant's subjective complaints of pain so long as the decision is supported by substantial evidence.  *See Aponte* v. *Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  Moreover, "an ALJ's credibility determination is generally entitled to deference on appeal."  *Selian*, 708 F.3d at 420; *see also Torres* v. *Colvin*, No. 12 Civ. 6527 (ALC)(SN), 2014 WL 4467805, at *4 (S.D.N.Y. Sept. 8, 2014) (collecting cases).

Here, the ALJ noted, "Consideration has been given to the subjective complaints of the claimant."  (SSA Rec. 25 (citing 20 C.F.R. § 404.1529 and SSR 96-7p)).  The ALJ found that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence, and limiting

32

effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.*).[23]

The Court finds that there is substantial evidence in the record to support this conclusion. While Plaintiff offered "detailed testimony" (Pl. Br. 13) of her symptoms and limitations, the majority of this testimony was relevant to the time of the 2011 hearing, not the relevant period of 2007 to 2008 (SSA Rec. 26). Moreover, as the ALJ noted, "the medical evidence does not substantiate the allegations of the claimant to the degree alleged." (*Id.* at 25-26). In this regard, Plaintiff alleged that she was debilitated to such a degree that she could only leave her bedroom for one hour per day and could not sit or stand for more than 15-20 minutes at a time. (*Id.* at 25, 54, 67, 76). The ALJ noted the lack of medical evidence prior to December 31, 2008, Plaintiff's date last insured, and found no evidence of impairments that were disabling to this degree. (*Id.* at 26). Specifically, the ALJ remarked that while there were "some treatment notes for asthma, left hip pain, and anxiety/depression" that generally supported some of her medically determinable impairments, he observed nothing in the record indicating that these ailments rose to the level of disability alleged by Plaintiff — such as hospitalizations or emergency room

---

[23]   Plaintiff asserts that the last part of this sentence — "to the extent they are inconsistent with the above residual functional capacity assessment" — demonstrates that the ALJ applied the wrong legal standard in evaluating Plaintiff's credibility. That is, Plaintiff argues that this clause shows that the ALJ improperly evaluated Plaintiff's testimony against his own residual functional capacity assessment rather than the medical record, as required under 20 C.F.R. § 404.1529(c)(4). (Pl. Br. 14). But it is clear from the ALJ's decision that the last part of this sentence is no more than an indicator of the degree to which he finds Plaintiff's claims incredible — which is "not entirely." (*See* SSA Rec. 25-26). The ALJ's full analysis of Plaintiff's credibility clearly sets forth and assesses relevant portions of the medical record.

treatments.  (*Id.*).  In addition, there was no evidence of any specific or ongoing mental health treatment during the relevant period, and Plaintiff admitted at her hearing that she had not sought therapy for any mental condition until one week prior to the 2011 administrative hearing.  (*Id.* at 26, 42-46).  Further, as mentioned previously, Plaintiff apparently sought no treatment for more than a year and a half after the expiration of her date last insured.  *See Kruppenbacher* v. *Astrue*, No. 04 Civ. 4150 (WHP)(HBP), 2010 WL 5779484, at *41 (S.D.N.Y. Apr. 16, 2010) (observing that a claimant's failure to seek treatment may be considered in assessing credibility and disability (collecting cases)), *report and recommendation adopted*, No. 04 Civ. 4150 (WHP), 2011 WL 519439 (S.D.N.Y. Feb. 14, 2011).

Moreover, while Plaintiff complained of hip pain during the relevant time period, tests taken at that time do not support her testimony: her 2007 x-ray and 2008 MRI both came back negative, and a 2007 examination demonstrated full range of motion of the left hip.  (*Id.* at 26, 279-81, 301). While the ALJ acknowledged that there was evidence *after* Plaintiff's date last insured of lower back pain and degenerative joint disease of the lumbar spine, there was simply no record evidence tying that impairment back to the 2007-2008 time period.  (*Id.* at 26).

### 3.   Plaintiff's "New Evidence" Does Not Warrant Further Proceedings

Plaintiff lastly objects that the Appeals Council erred by not considering two pieces of "new evidence" she submitted after the ALJ's decision: (i) the third "Multiple Impairment Questionnaire" from Dr. Choudhury, dated August 9,

2012, and (ii) the narrative report and another questionnaire from Dr. DeFeo, dated April 27 and May 1, 2012, respectively. (Pl. Br. 14-16). First of all, the Appeals Council *did* consider Plaintiff's new evidence, but rejected it as a basis for reversing or modifying the ALJ's decision. (SSA Rec. 4 ("The [ALJ] decided your case through December 31, 2008, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.")). In any event, Plaintiff's "new evidence" does not merit a remand.

The Act sets a stringent standard for remanding based on new evidence alone: "The court … may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g). Evidence is "new" if it is "not merely cumulative of what is already in the record." *Harris-Batten* v. *Comm'r of Soc. Sec.*, No. 05 Civ. 7188 (KMK)(LMS), 2012 WL 414292, at *6 (S.D.N.Y. Feb. 9, 2012) (citing *Lisa* v. *Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)). New evidence is "material" if (i) it is "relevant to the claimant's condition during the time period for which benefits were denied," (ii) it is "probative," and (iii) there is "a reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently." *Pollard* v. *Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (quotation marks and alterations omitted).

35

Plaintiff provides *no* reason, much less good cause, for failing to incorporate the new evidence into the record in the prior proceeding.  For this reason alone, Plaintiff's request for remand for consideration of new evidence should be denied.  But Plaintiff's "new evidence" is also merely cumulative of what was already on the record before the ALJ: while Dr. Choudhury's assessments become slightly more intensified in some instances, neither physician identifies any new limitations or diseases, and neither provides any new medical record evidence from the relevant period.  *See Harris-Batten*, 2012 WL 414292, at *6 ("Notably, however, the new evidence offers nothing by way of a more serious diagnosis related to Plaintiff's pain and bleeding, i.e., no new limitations or diseases are identified."); *Rodriguez ex rel. Mena* v. *Astrue*, No. 10 Civ. 305 (PKC), 2011 WL 2923861, at *13 (S.D.N.Y. July 7, 2011) (declining to remand case because additional medical evaluations did not "suggest that [claimant] has experienced any additional symptoms or conditions that are not already described in the record").

Next, neither of these reports — which were prepared in 2012, well after the time period during which Plaintiff was seeking disability benefits — provides any "new information about Plaintiff's medical condition or ability to work during the time period for which [s]he sought benefits."  *Harris-Batten*, 2012 WL 414292, at *6 (collecting cases rejecting post-hoc reports).  The mere fact that Dr. Choudhury and Dr. DeFeo purport to opine on the relevant time period based on 2012 examinations of Plaintiff and the record that was already before the ALJ does not add anything new to the record.  In light of the

36

foregoing, the Appeals Council properly determined that Plaintiff's "new evidence" would not have altered the ALJ's decision.

Having reviewed the entire record, the Court finds that the Commissioner's decision to deny Plaintiff's application for SSDI benefits is free from legal error and supported by substantial evidence in the record. Accordingly, there is no reason for it to be overturned.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed; Defendant's motion for judgment on the pleadings is GRANTED; and Plaintiff's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate the motions pending at Docket Entries 10 and 21, and to close this case.

SO ORDERED.

Dated:      January 22, 2015
            New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge